Good morning, Your Honors, and may it please the Court, David DeBolt appearing on behalf of Mr. Roscoe. I'm going to try to reserve three minutes of my time for rebuttal. Okay, thank you, Counselor. Due to the recent decision by this Court in U.S. v. Green, which affects our first argument, I'm going to confine myself to our second ground for vacating the $10 million restitution order in this case. And that argument is that the District Court used a methodology that was erroneous in calculating the restitution amount, given how the government tried to prove what the restitution should be. Under this Court's precedence, restitution may only compensate a victim for actual losses caused by the defendant's criminal conduct. That's the Gamatech case. And in Bussell, this Court said that that means what the District Court must do is compare what actually happened with what would have happened if the defendant had acted lawfully. Now, on appeal, the government acknowledges this general principle, but its arguments in the ruling below do not attempt to resolve this important issue of causation. The issue here was not whether the bank had advanced $10 million more than the eligible inventory would support as of the time of the advancement. Instead, what the Court needed to ask was how much of that over-advancement the bank could have recovered if there had been no unlawful conduct, in other words, no false statements. So making it more concrete, if Comerica, the bank here, had been told in May of 2003, instead of in November of 2003, that the credit advance exceeded what the inventory would support, the question is whether the government proved that the bank would have collected an additional $10 million of its principle with that additional six months of notice. Now, Counselor, isn't it so that the bank, I mean, having represented banks a little bit in my time, the bank did not necessarily have to shut down the debtor at the particular time where it finds out there's a problem. The bank could work that out over time, correct? That's correct, and in fact, that's what the bank did here, and we don't dispute that. But that's what the bank did here. The question is, does the $10 million that's been advanced in excess, why is it that it wouldn't have been able to collect the $10 million? The answer is pretty simple. There was no proof in this case that any of the money that was going through the company from May to November of 2003 was taken out of the company and lined the pockets of my client or anybody else. It was undisputed that the bank didn't have to do with it. What we're really talking about is what is the loss to the bank. Well, what we're talking about is what you're talking about is not whether your client put it in one place or the other. It's what is the loss to the bank. And the question is, what is the loss to the bank had the bank realized in May of 2003 that the account was over-advanced as opposed to learning in November? The money — I understand that, but then it comes back to my question. If they'd learned about that in May of 2003, they would have taken similar actions that they took when they did, which is work this out rather than just close down the debtor, and therefore, they would have got the $10 million. Well, no. They would have worked it out starting in May. In fact, they were already using the same approach in 2002, early 2003, late 2003. That's because that's what banks all do. Right. It's a lot easier when you've got a debtor — Right. — to let them work out, because if you automatically close them down, then at that point, you don't get your dollars. Right. You're in the bankruptcy, and you're getting dollar for donuts. So you work out, because you have all the collateral nonetheless. Right. And so all you're doing is working them out. So in effect, what this creditor did is take the bank for $10 million, which the bank would have collected. Well, no. The money had already been advanced. Well, I understand what they did. The issue — The advance was about having fraudulently taken them, because they misled the bank with the value of the inventory. No. The fraud was that in May of 2003, Mr. Roscoe told the bank, we have enough inventory to support what you have advanced. That statement was not true between May and November of 2003. You know, my concern, I think, is similar to Judge Smith's. Let's say — let's assume that you're right, that in May of 2003, when Mr. Roscoe began perpetrating the fraud, that the inventory was already overvalued. And so your point is that whatever portion of that overvaluation is, it should not be attributable to Mr. Mazur. Am I understanding that correctly? No. The point is that whatever situation they were in in May 2003, if Mr. Roscoe goes to the bank and says, we're overextended, what should we do? The bank would not have been able to get an additional $10 million from the company. Well, but — but here's what the bank could have done. Okay. Had Mr. Roscoe not perpetrated the fraud from May 2003 on, the bank could have started to tighten credit. And presumably, because this was an ongoing business at the time, different business decisions would have been made to try to keep the company afloat. And in the interim, the bank's tightening of the credit could have reduced the amount of overvaluation down to an appropriate amount. So in that scenario, they could have recovered the entire amount of overvaluation that's due to fraud. And our stand of review is abuse of discretion. So why is it unreasonable for the district court to have viewed it that way? Because the government never made the argument that you're presenting, Your Honor. Nor did the government ever try to prove anything except that money was flowing through the company, and they assumed that there was an extra $10 million that could be removed from the company over this period of time without shutting the business down. The testimony that they presented from the accountant for the company, Mr. Ballot said, if the bank tried to take that money, that overadvance, the company would have shut down. And we know from the testimony of the bank officers that they did not want that to happen, because they knew that if the company was allowed to wind down on a gradual basis, which it did into September of 2004, they would be able to collect a lot more than having basically a bankruptcy situation and a fire sale of the assets. All right. Well, let's assume that the government didn't make that argument. Is my scenario then unreasonable? The evidence is there in the record? There is no evidence in the record that says that they would have been able to tighten the credit during that period of time. They already actually had been tightening the credit from the previous loan amendment, which took the balance that the company could have down from $50 million to $25 million to $21 million starting in May of 2003. The bank was already doing those things. My worry is that the district court was trying to follow Berger or Bearshear, whatever you want to call it. I call it Berger, and I'm from Idaho. So they were trying to follow Berger. I mean, there are similarities between this case and Berger. Roscoe submitted false borrowing-based reports to Comerica, led the bank to believe the company continued to be in a financial position to warrant the $21 million line of credit. They weren't. They were only in a position to receive a little over $10 million. So Comerica recovered only a portion of the outstanding obligation through the repayment. That is much like Berger. And that's what the district court suggested. And that's how they came up with the amount. Actually, the defense asked the court to apply Berger because in Berger, the amount that was used for restitution purposes was the additional amount that was loaned out over the course of the fraudulent conduct, which in this case was $570,000 with a credit for previous payments that had been made. Berger says you have to look at the totality of the loan situation. You can't isolate it into individual events. And that was the argument the defense made in this case. The government did not want Berger to apply except for computing the sentencing guideline range for Mr. John Roscoe. Roberts. Well, but in you want to say you're going to reserve it. I would like to reserve it, if I could. Thank you. May it please the court. Morning, your honors. Owen Mardigan for the United States. The defendant in this case used fraud to keep over $10 million in loan proceeds that it was not entitled to. The district court was correct to order the defendant to pay that money back, plus interest. Is it true that you did not advance the good theory my colleague suggested in your argument to the district court? Did you hear her questions? I did. I did. And I, I. I mean, my worry is that I was exactly where she was when I, when I looked at this case. Exactly. Well, I. But then I started thinking, what did the government argue? And I'm afraid counsel's correct. You never did argue that theory. Well. Does that mean the theory's out? No, but I do believe that theory's irrelevant, your honor. Okay. Because the question, as, as you, as your honor posed it during counsel's argument, was what is the loss to the bank? The question is not, it does not include what the appellant has appended to it, which is, had the bank realized the account was over, was overdrawn in May of 2003. That's not part of the MVRA, that's not part of any of this court's precedent on restitution, and I don't think you'll find a case where this court advocates restitution that is somehow dependent on the victim's behavior or the victim's financial strategy. This bank may, and not to argue that it did, perhaps it, it behaved completely foolishly, perhaps it was blind, perhaps it was robbed blind. But this court sees victims who are robbed blind every day and who perhaps are behave foolishly or uneconomically. But that does not make them less of a victim, that does not make their loss less of a loss. So. Is the false statement that triggers the bank loss what was told the bank in May? It was what was told the bank in May and what was told the bank repeatedly through bad borrowing certificates from May through November of 2003. And in November, the bank discovered the full limits of its potential or actual loss? In November, yes, to a degree. To a degree, I would say yes. In November, there was a meeting which is described in the supplemental excerpts of record that is almost cinematic with the bank where the bank is saying, how could this happen, how could this happen? And when one of the bank officers sees that over $10 million is overdrawn, she says she believed it was a typo. So the bank is completely shocked at this November 2003 meeting to find out that the inventory had been in place. So May is the operative false statement? It's the first operative false statement of many. And November is the bank's realization of what had occurred, what they had in front of them? Except for the fraud, Your Honor. What they believed, based on what the defendant told them and what the CFO told them, is that they had some very poor accounting practices. As I understand your opponent's argument, it's that Ned Roscoe should only be responsible for the bank's loss between May and November. Is that your understanding of his argument? I believe that's his argument. What's your response? Berger, Your Honor, specifically page 1105 of the Berger decision, where the court I think makes a very key point. And they talk about why the district court's position is the more reasonable one compared to the defendant's. And they say, the amount of the outstanding debt at the time of Craig Electronics' default was greater than it would have been had the false statements never been made. That's really the key formulation here. And it's the variant of the way that counsel started off his argument when he said, restitution is about what happened compared with what should have happened. And where those intersect in this context in Berger is the amount of outstanding debt that shouldn't have been out there. And at the time of the default, which is just after November of 2003, that amount is $10.7 million approximately. And so your theory is that the amount of the outstanding debt is entirely attributable to the defendant, even if there's some indication that a portion of that might have been due to somebody else's conduct? There is no — this is all due to the defendant's conduct. Well, because counsel's making the argument that at the time the false statement was made in May, there was already suggestion that the inventory was overvalued. And so credit by Comerica was already extended in an amount in excess of what it should have been, because it's all tied into the underlying inventory. So as I understand his argument, the portion that's attributable to conduct that occurred or fraud that may have occurred prior to May of 2003, whatever the statement was made, shouldn't have been attributable to the defendant, because it's the government's burden to demonstrate that the amount of loss is due to the defendant's conduct. And that's the reason I asked counsel regarding that scenario of what the bank could have done had the fraud not been perpetrated by Mr. Roscoe in May of 2003. It could have started tightening its credit. Understood, Your Honor. But there are legal problems and there are factual and evidentiary problems with that argument. The first is the legal problem, which I've stated. The second, the factual problem, is that the bank didn't know. The bank had no idea that it was overextended on the credit line in May 2003, because at that point, it believed the value of the inventory was as it had been inflated. So there was an amount of money in May of 2003 that the defendant had that it should not have had and that it kept through fraud, beginning with the first bad borrowing certificate in May of 2003. And it perpetuated that fraud. And the way that this amount accumulated, this pool that is actually the amount of which is not in dispute, is three ways. It's first, it's by that first fraud that allowed the bank, the defendant rather, to keep money that it wasn't entitled to. The second is that it allowed the defendant to get about a half a million dollars in additional loan money from the bank through fraud. And the third is through the Dominion of Funds account, where it duped the bank into releasing the sales receipts, daily sales receipts in total on a weekly or actually a daily basis throughout the period of this fraud. So there are three actual areas where the bank's, the defendant's fraud allows it to accumulate this loss amount. Now, and I think the defendant would like to have this court look at only one of those, which is the actual additional loan advance amounts. But of course, that's not what Berger says. What Berger says is, we'd like to look at loss in the aggregate. It's reasonable to look at the complete amount of outstanding debt that's there that was only there due to the fraud. And that was the case here. My worry, I guess, is when I look at United States v. McHenry, it seems to suggest the loss must result from the act or acts done in the furtherance of the crime. And I'm trying to say then, it seems to me what you've got to argue is that what Roscoe did in May somehow furthered the bank doing acts that they would not have otherwise done. Correct. And they have already authorized a certain amount in May. And therefore, it seems as if the only authorizations that really would come from the conduct is that authorization that is done after May or that authorization which is not collected after May. Whereas if they will collect it over time nonetheless, that authorization not collected after May would not be much. Well, Your Honor, understood. Had the bank known in May of 2003 what it found out in November of 2003, the record suggests that November meeting would have happened in May. And there would have been a renegotiation of the agreement at least as there was after the November meeting, except it would have happened in May. I mean, that's how the bank operated. There's no reason to assume it would have been any different. But the fraud isn't all in May. It's every month. Every month when the defendant presented a fraudulent borrowing certificate and lulled the bank into thinking that this debtor's inventory was much more valuable than it was. But the subsequent frauds really don't matter one way or the other except as to the excess that's already going to accumulate from May thereafter. What else does that do? I mean, I appreciate you want to throw those facts at me. But what else is there I have to look at? What is their loss as a result of those? Every day, understood, and the reason is that every single day, all of the company's gross receipts go into an account that's controlled by the bank. Every single day, that bank has control over every dollar of the company's gross receipts. It only releases them based on this fraudulent misrepresentation that the inventory is valued at more than what it's worth. So every day from May through November, the bank is releasing this money that it could keep partially or in whole based on lies that the defendant made. All right. Thank you. Thank you, Your Honor. Your time has expired. Counselor, you've got about a minute and a half. Thank you, Your Honor. The judge found in this case of sentencing that this offense was an unrealistic effort by my client to try to keep the company from going out of business. The company was going to fail regardless of whether the fraud occurred. That's what the judge found. The bank was not going to get all of its money back because the company was not going to be able to continue to operate and generate that money. We don't say the bank acted foolishly in allowing the company to wind down in an ordered fashion. We say just the opposite. The bank in November of 2003 took the same approach it had been taking since 2001, which was to gradually wind down the business and allow it to sell its inventory in the ordinary course rather than as a fire sale. There was no evidence and not even a theory like the one that was presented here that had the bank done anything differently in May of 2003 that it would have ended up receiving less money over the course of the unwinding of that business. The bank got almost $8 million as a result of the strategy they chose. And there was no extra money that was floating out there that went into my client's pockets or went somewhere else. And there was not even any evidence of a Dominion of Funds account that actually existed until 2004. Well, but it seems like what you're really arguing is that the slim prospect of recovering the fraudulently obtained over advances is the big problem here. But it seems to me that that would allow your client's fraud behind there to be covered, if you will, by their financial difficulties. No. What I'm saying is you have to look at what amount of the bank's loss was caused by fraud and what amount of the bank's loss was caused by the fact that the company was failing. And we actually urged below and urged here taking the Berger approach, which is to say how much extra money did the bank loan between May of 2003 and November. That amount was $570,000. Everything else was already in. Is your acceptance of your argument dependent upon our accepting that the only result of the false statement made in May was the over-advance? It's the acceptance of the premise that the bank If you understand my question, give me a yes or no. No, it's not limited to that. Because it's a question of what the bank could have or would have done differently in May of 2003 other than advancing another $570,000. Thank you, Your Honors. Thank you very much for your argument on this case. Cases 12-101-108 and 12-10335 are now submitted.
judges: Hawkins, Smith, Nguyen